Carl Johnson, Appellee, v. William J. Kushler, Trading as Kushler Chevrolet Sales, Appellant.

**Gen. No. 36,260.**

Opinion filed February 21, 1933.

ANDREW J. FARRELL, for appellant; ALBION M. GRIFFIN, of counsel.

DONALD J. SEELEY, for appellee; MELVILLE, BLOCK, SAMUELS & SEELEY, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In a 4th class action in tort to recover damages for personal injuries received by plaintiff in an automobile collision early in the morning of January 24, 1932, as well as for property damage to his automobile in which he then was riding, there was a trial without a jury on May 18, 1932, resulting in the court finding defendant guilty ''in manner and form as charged in plaintiff's statement of claim,'' assessing the damages at $500, and entering judgment against defendant in that sum. The present appeal followed.

In his statement of claim plaintiff alleged in substance that on January 24, 1932, in the nighttime, defendant, by his driver or employee, had been operating his autotruck, with trailer attached, easterly on a public highway known as Higgins road in Cook county, Illinois; that defendant's driver had stopped the truck and trailer, and they were *standing* in the highway facing east; that plaintiff was riding in his automobile, ''driven by his agent,'' traveling easterly in the highway and was in the exercise of due care for his own safety; that it was defendant's duty not to permit the truck and trailer to remain in a stationary or immobile position in the highway, during the period of one hour after sunset until sunrise of any day, ''without exhibiting therefrom lighted lamps, as required by a statute of Illinois, showing a tail-light and three red lights in the reverse direction, so as to warn users of the highway, approaching or passing said truck and trailer, of their position on the highway''; that defendant by

his driver, not regarding said duty, then and there "negligently and carelessly," and "wantonly, willfully and maliciously," caused the truck and trailer to stand and remain on the highway without exhibiting said lights from the rear, and without giving other warnings or signals; that by reason of defendant's negligence and wanton conduct, plaintiff's automobile "ran into, collided and struck with great force and violence upon and against said trailer"; that as the result of the collision plaintiff received serious personal injuries to his damage in the sum of $500, and in addition his automobile was damaged to the extent of $500; and that plaintiff's total damages amount to the sum of $1,000, etc.

The statute referred to in plaintiff's statement of claim is evidently section 16, as amended, of the present Motor Vehicle Law of this State (Cahill's St. 1931, ch. 95a, ¶ 17, page 1924), which reads in part as follows (italics ours):

"(a) When upon any public highway in this State, during the period from one hour after sunset to sunrise, every motor bicycle shall carry one lighted lamp and every motor vehicle two lighted lamps showing white lights, . . . visible at least two hundred (200) feet in the direction toward which each motor bicycle or motor vehicle is proceeding, and each motor vehicle, trailer or semi-trailer shall also exhibit at least one lighted lamp which shall be so situated as to throw a *red light* visible in the reverse direction. . . .

"(c) After October 1, 1931, every motor vehicle of the second division as described in section 2 of this Act (i. e., one 'designed and used for pulling or carrying freight'), the length of which, together with any trailer or trailers in tow thereof, is more than 25 feet . . . . , while being operated on the public highways of this State outside the corporate limits of cities, towns and villages, during the period one hour after sunset

to sunrise, shall display, . . . on the rear thereof in a horizontal line approximately six inches apart, *three red lights* plainly visible at a distance of at least 200 feet; . . . also on the rear of the body of said vehicle, not more than 12 inches from the lower left hand corner, *one red reflector.* . . .

"(f) During the period from one hour after sunset to sunrise every . . . motor vehicle, which is *standing* on any road, highway or street, shall display a light on the front and at the rear of the same. However, etc." (Here follow provisions for parking without lights in any city, town or village, under rules prescribed by ordinance.)

In defendant's affidavit of merits, sworn to by an agent, it is denied that at the time and place plaintiff was in the exercise of due care for his own safety, or that defendant by his driver was guilty of the negligence or wanton conduct as charged, or that the truck and trailer were *standing* in the highway or were without the rear lights as required by statute, or that the collision was proximately caused by any negligence of defendant's driver.

On the trial plaintiff testified in his own behalf as to the happening of the accident, and he called five witnesses, passengers in his car, who gave their versions of the collision, which occurred about 2:15 o'clock, a. m., on a clear night in an open country district. Five men and three young women were in the car, which was of the sedan type for five passengers. One of the young women (not called as a witness) was the driver. She was seated on the left side of the front seat, and next to her sat plaintiff and next to him George Siegman. On the back seat were three men and in the laps of two were seated the two other young women. Plaintiff also called as witnesses a man named Crane, and a motorcycle policeman named Barnes, both of whom arrived on the scene of the accident after it had happened. The occupants of the car were on their way to

Chicago. They had been to a party, given by friends on a farm near Dundee, Illinois.

Plaintiff testified that he was the owner of the car; that the young woman driver "was driving the car for me"; that she had never driven it before; that he was sitting on the front seat between her and Siegman, and was looking forward; that she was driving the car at a speed "around from 35 to 38 miles per hour"; that he "had the front lights on, but the *dimmers* instead of the *brights*," and that they "would throw light ahead about 35 feet"; that "it is possible that I could have seen farther ahead if I had had the bright lights on"; that "travelling at a speed of 35 or 40 miles an hour, it is possible to stop my car within 10 or 12 feet"; that just before the crash he was looking ahead; that "in a fraction of a second I saw a car with no lights on it, and, as there was no chance to turn, we crashed head on into Kushler's trailer"; that "we were about *three or four feet* from the trailer *the first time I saw it*"; that he "*didn't see* any red lights or any red reflectors on the trailer"; that after he was taken out of the car and before taken to a hospital in Elgin for treatment he "looked at the trailer, saw that his car was about 8 or 10 feet behind it," that "he didn't notice" whether or not there were any lights on the rear of the trailer.

George Siegman, also seated on the front seat, testified that just before the collision we were "travelling about 30 to 35 miles an hour"; that the headlights of our car "would throw a light forward, maybe, 35 or 40 feet"; that "I didn't see any red lights, or red reflectors, or trailer lights"; that there "was a crash" and he "was knocked unconscious"; that he saw the trailer "just before the crash" and "it *looked to me* as if it was standing still on the highway."

The testimony of the three men on the back seat was to the effect that just before the collision each was "looking forward" and "didn't see" any red lights or

red.reflectors; and that the headlights on the car were throwing light forward a distance of "about 35 feet."

Plaintiff's witness, Crane, testified in substance that he was driving that night in his automobile, with his sister-in-law, westerly on the highway and "came across an accident"; that "there was one girl laying out in the highway and one of the young fellows of the party and myself picked her up and put her in our car and the rest of them got in themselves"; that he took all of them to a hospital in Elgin, Illinois; that before he left the scene of the accident he "didn't notice whether there was a light on the rear end of the trailer or not"; that the "lights on the truck were lit"; that as he approached the scene of the accident he saw the "smash-up" by means of the headlights on his car when he "was two blocks away"; that when he arrived "all of the lights on the sedan car were out."

Plaintiff's witness Barnes testified in substance that early in the morning in question he received notice and went to the scene of the accident; that he traveled easterly on his motorcycle with his headlight burning; that he first noticed the sedan car and the trailer, "when I was about a block from the wreck, because I had a master spotlight"; that no persons were then at the scene of the accident; that he noticed "a skid mark of about 10 feet on the highway caused by the iron that connects the trailer to the truck where it had been shoved ahead"; that he examined the trailer and "found a 1931 license plate"; that there were no burning lights or any reflectors on the trailer; but that he saw there were some lights which had been broken.

On defendant's behalf Alfred E. Foster, the driver of the truck and trailer, and several other witnesses gave testimony. Foster testified in substance that he left Janesville, Wisconsin, about 11 p. m., bound for Chicago; that on the truck he carried as freight an

automobile and on the trailer two other new automobiles; that the tail lights on the two automobiles on the trailer were lit; that on the rear of the trailer there was one burning red tail light and two reflectors; that one of the reflectors was red, called the "King Bee" reflector; that he examined all lights upon leaving Janesville and found them in good working order; that when he reached Crystal Lake, about 17 miles away from the scene of the accident, he stopped and before starting on again "checked up" the lights; that all were lit and in good working order, and nothing happened to exinguish any of them before the accident; that when it happened he was not standing still but was traveling on the right-hand side of the road easterly about 15 or 20 miles an hour and up a slight grade; that suddenly, without hearing any horn or other warning, he felt a severe "impact" from the rear and heard much "screaming and hollering"; that he stopped, went back and found that the sedan car had crashed into the rear of the trailer; that one of the doors of the car was jammed, so that passengers could not get out; that he procured a crank handle and opened the door and otherwise rendered assistance; that after all the passengers had been taken away in another automobile, he remained there for about 20 minutes; that he noticed that, because of the impact, the wire connecting the trailer with the battery on the truck had been severed, that all lights on the trailer were extinguished, and that the tail light and reflectors on the rear of the trailer were "busted" and the remains of them scattered on the road; that there "were marks on the pavement about 8 or 10 feet long where the tongue of the trailer had dropped and scraped."; that he left the scene of the accident with the truck for Chicago, leaving the trailer standing where it was and returned in his own automobile as soon as possible.

Clark Stevers, defendant's witness and employee, testified that he went from Chicago, in company with Foster, to the scene of the accident, arriving there before daylight; that the trailer was standing on the right-hand side of the road; that its rear lights were broken, but that the rear red light of the rear automobile which was on the trailer was still burning; that he put on both the headlights and rear light of the front automobile which was on the trailer; that the rear of the trailer was badly "banged up"; that he saw no police officer there when he arrived; and that he returned to the scene of the accident during the afternoon.

J. B. Watson, defendant's witness and employed by him as a mechanic, testified that on the afternoon of January 23, 1932, he "checked the lights and electric system on the trailer and truck" which were afterwards in the accident; that the lights "were all in good condition and all working"; that "the battery that lighted these lights was in the truck"; that there were two lights on the rear of the trailer,—the "stop and the tail," and also two reflectors; and that they "all were clear" when he examined them.

Joseph Derrig, superintendent of the company that manufactures the "King Bee" reflectors, gave testimony as to certain tests which he had made of them, and a red reflector just like the one that was on the trailer at the time of the accident was offered and admitted in evidence, and is attached to the present record. Derrig's testimony, as to the results of said tests, is to the effect that, if such a reflector is attached in the usual way to the rear of a moving or standing automobile, and about two feet above the surface of a concrete road, and if another automobile with the usual headlights burning is approaching from the rear, such reflector will on a clear night reflect the rays of light so that they will "loom up 200 feet ahead." And

the witness expressed the opinion, based upon said tests, that "it would make no difference whether or not there was any light on the back (of said moving or standing automobile), because the headlights (on said approaching automobile) would reflect on the reflector." And the witness further testified that the particular type of reflector was "approved by the Secretary of State of Illinois on August 28, 1931."

After reviewing the present record, and considering all the facts and circumstances in evidence and the briefs of respective counsel, we have reached the conclusion that the judgment appealed from cannot stand. We do not think that defendant is under any liability to plaintiff because, in our opinion, it appears from a clear preponderance of the evidence that the damages suffered by plaintiff were proximately caused by his own negligence and that of the young woman driving his car at the time as his agent or servant. (See *Hanusik v. Hanlon*, 258 Ill. App. 114, 119; *Johnson v. Newman*, 168 Ark. 836, 839, 840.) Each was guilty of contributory negligence in not keeping a sufficient lookout ahead that would have enabled them, had they been looking, to have discovered defendant's trailer and truck as they were approaching them, and to have checked or stopped the automobile in which they were riding in time to have avoided the collision. (See *Johandes v. Chicago, M. & St. P. R. Co.*, 260 Ill. App. 328, 331, 332; *Phillips v. Davis*, 3 F. [2d] 798, 799; *James v. Motor Transit Management Co.*, 260 Ill. App. 246, 257.) Furthermore, it clearly appears under all the facts and circumstances in evidence in this case that plaintiff was negligent in allowing his car to be driven on a dark, though clear, night on a highway in a country district without having his *bright* headlights burning. (*Johnson v. Gustafson*, 233 Ill. App. 216, 223; *Sugru v. Highland Park Yellow Cab Co.*, 251 Ill. App. 99, 102, 103.) In the first of the last cited cases it was

held that the provisions of section 16, par. (a), of the Motor Vehicle Law, above quoted, "were intended for the guidance and benefit of the person *driving* the automobile as well as for the protection of others who may use the highway" (233 Ill. App. 221).

The judgment appealed from is reversed, with finding of facts, and cause is not remanded.

*Reversed with finding of facts.*

SCANLAN, P. J., concurs.

Finding of facts: We find as facts in this case that both plaintiff and his agent, who was driving his automobile at the time and place, were guilty of negligence, and that the collision in question, as well as the resulting damages to plaintiff, were proximately caused by said negligence.